A & M RECORDS, INC.
1416 North LaBrea Avenue
Hollywood, California 90028

Dated:   as of April 15, 1983

Mr. Gary Taylor
c/o Louise West, Esq.
45 Bayeau Road
New Rochelle, New York   10804

Dear Mr. Taylor:

The following shall constitute your and our agree-
ment with respect to your recording for us during the term
of this contract master recordings embodying your performances
(hereinafter sometimes referred to individually by the term
"Master" and collectively by the term "Masters"):

1.    The term of this contract shall consist of an
initial period commencing as of the date hereof and continuing
until the date one hundred and twenty (120) days after the
delivery of the recording commitment for the initial period
hereof, as defined in paragraph 2(a) below, and of the addi-
tional renewal period or periods hereinafter provided.  No
contract period shall expire prior to the date upon which our
rights to elect additional Masters in respect of such contract
period shall expire, and in the event (and to the extent that)
we elect such additional Masters, such contract period shall
continue in effect until one hundred twenty (120) days
following the delivery thereof.

2.    (a)  During the initial period hereof, You
shall deliver to us at a minimum two Masters previously
recorded by you (hereinafter the "First Single") as set
forth on Schedule A hereto, and you shall record and
deliver to us, at our election to be exercised within
sixty (60) days after the initial release in the United
States of the First Single, additional Masters sufficient
to constitute either an additional seven-inch 45 rpm
single record (hereinafter the "Second Single") or one
twelve-inch, 33-1/3 rpm long playing record (which may
or may not include the Masters embodied on the First
Single) of no fewer than thirty-five (35) and no more
than forty (40) minutes in duration (hereinafter the
"First LP").  In addition, in the event that we elect

to have you record and deliver to us the Second Single, we shall have the right to elect, within sixty (60) days after the initial release in the United States of the Second Single, to have you record and deliver to us additional Masters sufficient to constitute the First LP (which may or may not include any of the Masters embodied on the First and Second Singles), plus, at our election in the manner prescribed in paragraph 2(c) below, a second LP. During each renewal period, you shall record and deliver a minimum of one (1) LP (plus, at our election in the manner prescribed in paragraph 2(c) below, a second LP). The Masters which you are required to record hereunder in accordance with the foregoing during a specific contract period (including additional Masters when elected by us) are hereinafter sometimes referred to collectively as "your recording commitment for such contract period."

(b) Each Master shall embody your performance as the sole featured artist of a single musical composition previously unrecorded by you and shall be recorded in its entirety at a recording studio or studios. Accordingly, but without limiting the generality of the foregoing, no Masters shall be recorded in whole or in part at live concerts or other live performances. Each LP recorded hereunder shall embody no less than eight (8) and no more than ten (10) musical compositions. The musical compositions or other selections which shall be embodied in the Masters, the individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters, the studio or studios at which the Masters shall be recorded, and the dates of recording (hereinafter sometimes referred to as the "Recording Elements") shall be designated by you and shall be subject to our approval. We hereby acknowledge that you have designated and we have approved you as the producer of the Second Single, if any, and the First LP, if any. You shall advise us in writing of the Recording Elements so designated by you prior to or concurrently with your submission to us of the proposed recording budget referred to in paragraph 3(a). If we shall disapprove of any Recording Elements so designated by you, then our decision with respect thereto (including, at our election, our designation of one or more Recording Elements in substitution for any Recording Elements designated by you and disapproved by us) shall be final. Each Master shall be subject to our approval as technically satisfactory for the manufacture and sale of phonograph records, and, upon our request, you shall re-record any musical compositions or other selection until a Master technically satisfactory to us shall have been obtained.

2

(c)   You shall deliver to us the Masters constituting the First Single promptly upon the execution hereof. Unless we shall notify you to the contrary in writing, you shall record and deliver to us the Masters constituting the Second Single, if any, within one hundred twenty (120) days after our election to have you record and deliver to us such Second Single, and you shall record and deliver to us the Masters constituting the First LP, if any, within one hundred twenty (120) days after our election to have you record and deliver to us such First LP.   In addition, we shall have the right in respect of the initial period, exercisable by notice to you within eight (8) months following your delivery to us of the First LP or four months following our initial U.S. release thereof, whichever is earlier, to increase your recording commitment by an additional LP, which shall be recorded and delivered within one hundred twenty (120) days following our such notice.   Unless we shall notify you to the contrary in writing, you shall record and deliver to us the Masters constituting the minimum LP of your recording commitment for each renewal period hereof, if any, within one hundred twenty (120) days after the commencement of such period.   In addition, we shall have the right in respect of each renewal period, exercisable by notice to you within eight (8) months following your delivery to us of such LP or four (4) months following our initial U.S. release thereof, whichever is earlier, to increase your recording commitment by an additional LP, which shall be recorded and delivered within one hundred twenty (120) days following our such notice.

(d)   You shall not record hereunder nor shall we be obligated to accept as applying toward the fulfillment of your recording commitment for any contract period Masters constituting a so-called "multiple album" (i.e., a single package containing two (2) or more LPs [or their tape equivalent] which is sold as a single unit).   However, in the event you shall do so, and we shall so accept such Masters hereunder, then, at our election, for the purpose of calculating the number of Masters which shall apply toward the fulfillment of your recording commitment for such period, such Masters shall be deemed to be the equivalent of only one (1) LP.

(e)   Any master recordings which are not recorded or delivered in all respects in accordance with the terms and provisions hereof shall not, unless we otherwise consent in writing, apply toward the fulfillment of your recording commitment for any contract period.   Furthermore, in the event we shall make any

3

payments in respect of any such master recordings which shall not have been recorded or delivered in all respects in accordance with the terms and provisions hereof, you shall, upon our demand, promptly reimburse us for any such payments. In the event you shall fail to so reimburse us, we shall, in addition to all of our other rights or remedies which we may have in such event, have the right to deduct an amount equal to such payments from any monies payable by us to you hereunder or under any other agreement between you and us or our affiliates.

(f) In the event you shall for any reason whatsoever delay the commencement of, or be unavailable for, any recording sessions hereunder, you shall, upon our demand, promptly reimburse us for any expenses or charges actually incurred or paid by us by reason thereof. In the event you shall fail to so reimburse us, we shall, in addition to all of our other rights or remedies which we may have in such event, have the right to deduct an amount equal to such expenses or charges from any monies payable by us to you hereunder or under any other agreement between you and us or our affiliates.

3.    (a)  Recording sessions for the Masters shall be conducted under our recording license. No recording sessions shall be commenced hereunder nor shall any commitments be made or costs incurred in connection therewith unless and until a proposed recording budget for the Masters to be recorded at such sessions shall have been submitted by you in writing and approved in writing by one of our officers. You shall submit to us such proposed recording budget no later than fourteen (14) days prior to the first recording session for which such proposed recording budget is submitted. We shall not be responsible for any payments to any individuals rendering services in connection with the recording of the Masters which exceed union scale unless such excess and the proposed recipient thereof are specified in said budget and approved by us. We shall not be responsible for any penalties incurred for late payments caused by your delay in submitting union contract forms, report forms or bills, unless we shall agree to pay said penalties, in which case, they shall be deemed part of recording costs. We shall pay the recording costs of the Masters recorded at recording sessions conducted hereunder in accordance with the terms and provisions hereof in an amount not in excess of the recording budget therefor approved in writing by one of our officers. In the event the recording costs of such Masters shall exceed the approved budget therefor, you shall, upon our demand, promptly reimburse us for all

4

such excess costs, and in the event you shall fail to do so, we shall, in addition to all of our other rights and remedies in such event, have the right to deduct an amount equal to all such excess costs from any monies payable by us to you hereunder or under any other agreement between you and us or our affiliates.

(b)   All union contract forms and report forms for recording sessions hereunder, all bills pertaining to such recording sessions, and all necessary payroll forms (including, without limitation, all necessary W-4 and other withholding tax forms) pertaining to such recording sessions shall be submitted by you to us within forty-eight (48) hours after each recording session and in accordance with all applicable union requirements so that we shall be able to make all payroll payments without penalty for late payment.

(c)   We shall make all minimum union scale payments required to be made to you in connection with your recording services hereunder.  All such payments, as well as all payments made by us to any other individuals rendering services in connection with the recording of the Masters, all other payments which are made by us pursuant to any applicable law or regulation or the provisions of any collective bargaining agreement between us and any union or guild (including, without limitation, payroll taxes and payments to union pension and welfare funds), all amounts paid or incurred by us for studio or hall rentals, tape, engineering, editing, instrument rental and cartage, mastering, transportation, accommodations, immigration clearances, and so-called "per diems" in respect of any individuals (including you) rendering services in connection with the recording of the Masters, together with any and all other amounts paid or incurred by us in connection with the recording of the Masters shall be recoupable from royalties earned by you hereunder or under any other agreement between you and us or our affiliates.

(d)   You shall deliver to us a two-track stereo tape, and, upon our request, a monaural tape for each Master.  All original session tapes and any derivatives or reproductions thereof shall also be delivered to us or maintained at a recording studio or other location designated or approved by us, in our name and subject to our control.

4.   All master recordings recorded by you during the term hereof, from the inception of the recording thereof, and all phonograph records and other reproductions made

therefrom, together with the performances embodied therein and all copyrights therein and thereto, and any and all renewals and extensions thereof shall be entirely our property, free of any claims whatsoever by you or any other person, firm or corporation. For the purposes hereof, you and all other persons shall be our employees for hire and all such master recordings shall be works made for hire under the United States Copyright Law. We shall, accordingly, have the sole and exclusive right to copyright such master recordings, phonograph records, or other reproductions, in our name, as the owner and author thereof, and to secure any and all renewals and extensions of such copyrights in our name. Nevertheless, you shall, upon our request, execute and deliver to us any assignments of copyright (including renewals and extensions thereof) in and to such master recordings as we may deem necessary, and you hereby irrevocably appoint us your attorney-in-fact for the purpose of executing such assignments in your name. Without limitation of any of the foregoing, we and/or our designees shall have the exclusive worldwide right in perpetuity to manufacture, sell, distribute and advertise phonograph records or other reproductions (visual and nonvisual) embodying such master recordings, to lease, license, convey or otherwise use or dispose of such master recordings by any method now or hereafter known, in any field of use, to release phonograph records or other reproductions embodying such master recordings under any trademarks, trade-names or labels, to perform such phonograph records or other reproductions publicly, and to permit the public performance thereof by radio or television broadcast, or any other method now or hereafter known, all upon such terms and conditions as we may approve, and to permit any other person, firm or corporation to do any or all of the foregoing or we may refrain from doing any or all of the foregoing.

    5.   (a)  We shall have the worldwide right in perpetuity to use and to permit others to use your name (both legal and professional, and whether presently or hereafter used by you), likeness, other identification, and biographical material concerning you, and the name and likeness of any producer rendering services in connection with the master recordings recorded by you during the term hereof, for purposes of trade, and otherwise without restriction, in connection with such master recordings, the phonograph records derived therefrom, and our record business and products. We shall have the further right to refer to you during the term hereof by your legal or professional name as our exclusive recording artist and you shall in your activities in the entertainment field use all reasonable efforts to be billed and advertised during the term

6

hereof as our exclusive recording artist. The rights granted to us pursuant to this paragraph with respect to your name, likeness, other identification and biographical material concerning you shall be exclusive during the term hereof and non-exclusive thereafter. Accordingly, but without limiting the generality of the foregoing, you shall not during the term hereof authorize or permit any person, firm, or corporation other than us to use your legal or professional name or your likeness in connection with the advertising or sale of phonograph records.

(b) We shall also have the exclusive world-wide right in perpetuity to use and to license others (including, without limitation, any person, firm or corporation affiliated with us) to use your name (both legal and professional, and whether presently or here-after used by you), likeness, picture and portrait in connection with the manufacture, distribution and sale of any and all other products and services in addition to the master recordings recorded by you during the term hereof and phonograph records derived therefrom. We shall credit your royalty account hereunder with an amount equal to one-half (1/2) of the net royalty or net flat fee actually received by us in connection with our exercise of the rights granted pursuant to this subparagraph (b) in respect of such other products and services.

6. Conditioned upon your full and faithful performance of all of the material terms and provisions hereof, you shall be paid in respect of the sale by us or our licensees of phonograph records embodying the Masters recorded hereunder and in respect of any other exploitation by us or our licensees of such Masters, the following royal-ties upon the terms hereinafter set forth:

(a) (i) (A) In respect of records sold in the United States, the United Kingdom and Canada in the form of LP length (or longer) discs and pre-recorded tapes (including reel-to-reel tapes, cartridges and cassettes) or other recorded devices (other than discs), we shall pay you a royalty at the rate of twelve percent (12%) of the suggested retail list price from time to time ("SRLP") of such records; and (B) in respect of records sold by our licensees in the United States in the form of pre-recorded tapes (including reel-to-reel tapes, cartridges and cassettes) or other recorded devices (other than discs), we shall pay you a royalty at the rate of one-half (1/2) of the aforementioned royalty rate based upon the SRLP of such records.

7

(ii)   In respect of so-called "singles" and EP's sold in the United States, the United Kingdom and Canada, we shall pay you a royalty at the rate of eleven percent (11%) of SRLP of such records.

(b)   In respect of records sold outside of the United States we shall pay you a royalty at the rate of six percent (6%) of the SRLP of such records in the country of manufacture, the country of sale, the country of import, or the country of export, as we shall be paid. If there are no suggested retail list prices of records in any particular country, then for the purposes of computing royalties hereunder, the prices of records in such country generally regarded as the equivalent thereof shall be deemed the suggested retail list prices of such records.

(c)   Notwithstanding any of the foregoing:

(i)   the royalty rate in respect of records sold through any direct mail or mail order distribution method (including, without limitation, record club distribution), and/or sold through retail stores in conjunction with special radio or television advertisements (including, without limitation, records of the type presently distributed by K-Tel) shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions, or one-half (1/2) of the net royalty which we shall receive from any licensee distributing such records, whichever is less;

(ii)   the royalty rate in respect of the sale of records on a mid-priced record line shall be three-fourths (3/4) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions and the royalty rate in respect of the sale of records on a budget record line or low-priced record line shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions;

(iii)   the royalty rate in respect of records sold for use as premiums or in connection with the sale, advertising, or promotion of any other product or service shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions,

and shall be based upon the price received by us for such records sold by us and upon the price utilized by our licensees in accounting to us for such records sold by our licensees;

(iv)  the royalty rate in respect of records sold to the United States Government, its subdivisions, departments or agencies (including records sold for resale through military facilities), and in respect of records sold to educational institutions or libraries, shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions; and

(v)  the royalty rate in respect of Masters licensed by us for phonograph record use on a flat-fee basis and for all other types of use (other than phonograph record use) on a flat-fee or royalty basis shall be an amount equal to thirty-three and one-third percent (33-1/3%) of the net flat fee or net royalty, as the case may be, received by us in respect of each such use.

(d)  Notwithstanding any of the foregoing, no royalties shall be payable on records furnished as free or bonus records to members, applicants, or other participants in any record club or other direct mail distribution method; on records distributed for promotional purposes to radio stations, television stations or networks, record reviewers, or other customary recipients of promotional records; on so-called "promotional sampler" records; on records sold as scrap or as so-called "cut-outs"; and on records distributed on a so-called "no-charge" or "free" basis (such as, but not limited to, records commonly described in the record industry as "free-goods" or "freebies") or sold at less than fifty percent (50%) of their regular wholesale price to distributors, subdistributors, dealers, or others, whether or not the recipients of such records are affiliated with us and whether or not such records are intended for sale by the recipients thereof.

(e)  Notwithstanding any of the foregoing, royalties in respect of records sold at a discount to distributors, subdistributors, dealers, or others, whether or not affiliated with us (except for records sold at less than fifty percent (50%) of their regular wholesale price, for which no royalties are payable hereunder) shall be reduced in the same proportion as the regular wholesale price of such records is reduced on such sales.

(f) Notwithstanding any of the foregoing:

(i) for purposes of computing royalties there shall be deducted from the suggested retail list price (or other applicable price, if any, upon which royalties are calculated) of phonograph records hereunder an amount equal to any excise, sales, value added, or comparable or similar taxes;

(ii) for purposes of computing royalties, there shall be deducted from the suggested retail list price (or other applicable price, if any, upon which royalties are calculated) of phonograph records hereunder, an amount equal to ten percent (10%) thereof for 45 rpm single records packaged in color or other special printed sleeves, and for long playing or extended play records in disc form packaged in our standard "singlefold" album jackets without any special elements (such as, but not limited to, inserts or attachments); twelve and one-half percent (12-1/2%) thereof for all other long playing or extended play records in disc form; and twenty percent (20%) thereof for reel-to-reel tapes, cartridges, cassettes or other recorded devices (other than discs);

(iii) royalties shall be computed and paid upon ninety percent (90%) of net sales for which payment has been received; provided, however, that if any licensee distributing records hereunder through record clubs or other methods of mail order distribution shall compute and pay royalties to us in respect of such records on less than ninety percent (90%) of net sales, your royalties hereunder with respect to such records shall be computed and paid on the same percentage of sales as such licensee shall utilize in computing and paying to us royalties in respect of such records; and

(iv) records distributed in the United States by any of our affiliated branch wholesalers shall be deemed sold for the purposes of this contract only if sold by any such affiliated branch wholesaler to one of its independent third party customers.

(g) Notwithstanding any of the foregoing:

(i) the royalty payable to you hereunder with respect to any phonograph record embodying Masters hereunder together with other master recordings shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be the number of selections contained on the Masters hereunder which are embodied on such phonograph record and the denominator of which shall be the total number of selections embodied on such phonograph record; and

(ii) the royalty payable to you hereunder and the recording costs hereunder with respect to any Master recorded hereunder by you jointly with any other artist or musician to whom we are obligated to pay a royalty in respect of such Master shall be computed by multiplying the otherwise applicable royalty rate and recording costs by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the sum of one (1) and the total number of such other artists or musicians whose performances are embodied thereon.

7. (a) Statements as to royalties payable hereunder shall be sent by us to you on or before the thirtieth day of September for the semiannual period ending the preceding June 30th and on or before the 31st day of March for the semiannual period ending the preceding December 31st, together with payment of accrued royalties, if any, earned by you hereunder during such semiannual period, less all advances and charges under this contract or under any other agreement between you and us or any of our affiliates. We shall have the right to retain, as a reserve against charges, credits, or returns, such portion of payable royalties as shall be reasonable in our best business judgment.

(b) No royalties shall be payable to you in respect of sales of records by any of our licensees until payment therefor has been received by us. Sales by any such licensees shall be deemed to have occurred in the semiannual accounting period during which such licensees shall have rendered to us accounting statements for such sales. Each reserve shall be liquidated within the three (3) semi-annual periods following the semi-annual period in respect of which such reserve is established. Returns shall be prorated between "sold"

11

goods and "free" goods in the same proportions as originally invoiced.

(c) Royalties in respect of the sale of records outside of the United States shall be computed in the national currency in which we are paid by our licensees, shall be credited to your royalty account hereunder at the same rate of exchange as we are paid, and shall be proportionately subject to any transfer or comparable taxes which may be imposed upon our receipts. In the event we shall not receive payment in United States dollars in the United States in respect of any such sales, royalties in respect thereof shall not be credited to your royalty account hereunder. We shall, however, if we are able to do so, accept such payments in foreign currency and deposit in a foreign bank or other depository, at your expense, in such foreign currency, such portion thereof, if any, as shall equal the royalties which would have actually been payable to you hereunder in respect of such sales had such payments been made to us in United States dollars in the United States and we shall notify you thereof promptly. Deposit as aforesaid shall fulfill our royalty obligations hereunder as to such record sales.

(d) You shall be deemed to have consented to all royalty statements and all other accountings rendered by us hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by you to us within one (1) year after the date rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by us hereunder may be maintained against us unless such action, suit, or proceeding is commenced against us in a court of competent jurisdiction within one (1) year after the date rendered.

(e) We shall maintain books of account concerning the sale of phonograph records hereunder. You, or an independent certified public accountant, in your behalf, may, at your sole expense, examine our said books relating to the sale of records hereunder (but excluding any of our books or records relating to the manufacture of records hereunder) solely for the purpose of verifying the accuracy thereof, only during our normal business hours and upon reasonable written notice. Our such books relating to any particular royalty statement may be examined as aforesaid only within one (1)

year after the date rendered and we shall have no obligation to permit you to so examine our such books relating to any particular royalty statement more than once. The rights hereinabove granted to you shall constitute your sole and exclusive rights to examine our books and records.

(f)  All monies paid to you or on your behalf or to or on behalf of any person, firm or corporation representing you, other than royalties payable pursuant to this contract, shall constitute advances recoupable from any sums payable under this contract or under any other agreement between you and us or our affiliates, unless we otherwise consent in writing.

(g)  We shall have the right to deduct from any amounts payable to you hereunder such portion thereof as may be required to be deducted under the applicable provisions of the California Revenue and Taxation Code or under any other applicable statute, regulation, treaty or other law, or under any applicable union or guild agreement, and you shall promptly execute and deliver to us such forms and other documents as may be required in connection therewith.

(h)  Each payment required to be made by us to you pursuant to this contract, other than union scale payments pursuant to paragraph 3 hereof, shall be made by a single check payable to "Gary Taylor".

8.    (a)  All selections recorded in any Masters hereunder which are written or composed by you, in whole or in part, alone or in collaboration with others, or which are owned or controlled, in whole or in part, directly or indirectly, by you, or any person, firm or corporation in which you have a direct or an indirect interest (herein referred to as "Controlled Compositions") are hereby licensed to us for the United States and Canada at the applicable royalty rates set forth below per selection on the basis of records sold, less returns and credits, except that no copyright royalties shall be payable in respect of any records for which no royalties are payable pursuant to paragraph 6 hereof:

(i)  With respect to Controlled Compositions embodied in records sold in the United States, an amount (hereinafter referred to as the "Basic U.S. Copyright Rate") equal to three-quarters (3/4) of the minimum United States statutory copyright royalty rate in effect on the date of the initial release in the United States on a phonograph record of each such Controlled Composition.

(ii)  With respect to Controlled Composi-
tions embodied in records sold in Canada, an amount
(hereinafter referred to as the "Basic Canadian
Copyright Rate") equal to the greater of either
(A) three-quarters (3/4) of the minimum Canadian
statutory copyright royalty rate in effect on the
date of the initial release in Canada on a phono-
graph record of each such Controlled Composition
or (B) two cents ($.02) Canadian.

(b)  Notwithstanding the foregoing, the maximum
aggregate copyright royalty rate payable by us in respect
of any long-playing record album hereunder containing
one (1) or more disc records or the tape equivalent,
regardless of the number of selections contained therein
(and regardless of the number thereof constituting
Controlled Compositions), shall be ten (10) times the
Basic U.S. Copyright Rate with respect to records sold
in the United States, and ten (10) times the Basic
Canadian Copyright Rate with respect to records sold in
Canada and the maximum aggregate copyright royalty rate
payable by us in respect of any 45 rpm single record or
any EP hereunder, regardless of the number of selections
contained thereon (and regardless of the number thereof
constituting Controlled Compositions), shall be two (2)
times, and four (4) times, respectively, the Basic U.S.
Copyright Rate with respect to such records sold in the
United States and two (2) times, and four (4) times,
respectively, the Basic Canadian Copyright Rate with
respect to such records sold in Canada.  Accordingly,
in the event the actual aggregate copyright royalty rate
which we shall be required to pay in respect of any
long-playing record album, single record or EP hereunder
shall exceed the applicable maximum aggregate copyright
royalty rate hereinabove specified, then the aggregate
copyright royalty rate for the Controlled Compositions,
if any, contained thereon shall be reduced by an amount
equal to such excess.  If the actual aggregate copyright
royalty rate which we shall be required to pay in respect
of any such long-playing record album, single record or
EP, as the case may be, shall, even as reduced in accord-
ance with the immediately preceding sentence, still exceed
the applicable maximum aggregate copyright royalty rate
hereinabove specified, then we shall have the right, at
cur election, in addition to all of our other rights or
remedies which we may have in such event, to deduct an
amount equal to the additional payments required to be
made by us as a result thereof from any monies payable
to you hereunder or under any other agreement between
you and us or our affiliates.

14

(c)  No copyright royalties shall be payable in respect of Controlled Compositions which are arrangements of selections in the public domain.

(d)  Any assignment made of the ownership or copyrights in or the rights to license or administer the use of any Controlled Compositions shall be subject to the terms and provisions hereof.

(e)  You shall, upon our request, cause to be issued to us mechanical licenses for all selections recorded in any Masters hereunder which are not Controlled Compositions.  Such mechanical licenses as you shall cause to be issued to us shall be at rates and upon terms no less favorable to us than those contained in the then-current standard mechanical license issued by The Harry Fox Agency, Inc. with respect to records sold in the United States and by CMRRA with respect to records sold in Canada.  In the event you shall not cause to be issued to us any mechanical licenses for any selection recorded in any Master hereunder, the Master in which such selection shall have been embodied shall be deemed nct to have been delivered to us hereunder.

9.  You hereby warrant, represent, and agree that:

(a)  You are under no disability, restriction, or prohibition, whether contractual or otherwise, with respect to your right to execute this contract, to grant the rights granted by you to us hereunder, to perform each and every term and provision hereof, and to record each and every selection recorded by you hereunder.  In this regard, you specifically warrant and represent that no selection recorded by you hereunder is or shall be subject to any re-recording or other restrictions pursuant to any other agreement to which you are or have been party or by which you are otherwise bound.

(b)  During the term of this contract you shall become and remain a member in good standing of any appropriate labor union or unions with which we may at any time have an agreement lawfully requiring such union membership.

(c)  All recording sessions with respect to the Masters shall be conducted in all respects in accordance with the then current AF of M Phonograph Record Labor Agreement, the then current AFTRA Code for the Phonograph Industry, and the then current agreements with all other unions having jurisdiction over the recording of the Masters.

(d) No Controlled Compositions nor any other selections, materials, ideas, or other properties furnished or selected by you and embodied or contained in or used in connection with the Masters or the packaging or advertising for phonograph records hereunder will violate or infringe upon any common law or statutory right of any person, firm or corporation, including, without limitation, contractual rights, copyrights, and rights of privacy.

(e) There are no recordings embodying your performances which have not heretofore been commercially released in the United States on phonograph records.

(f) You shall not at any time, directly or indirectly, give or offer to give any consideration of any kind to any radio or television station or network, to any employee thereof, or to any person, firm, or corporation controlling or influencing the programming of such station for the purpose of securing the broadcast or promotion of any records hereunder.

(g) Except as otherwise specifically provided herein, we shall have no obligation hereunder or otherwise to pay any person, firm, or corporation any amounts in connection with the recording or exploitation of the Masters.

10. (a) During the term of this contract, you shall not enter into any agreement or make any commitment which would interfere with your performance of any of the terms and provisions hereof nor shall you perform or render any master recordings for any person, firm, or corporation other than us. After the expiration or termination of the term of this contract, you shall not prior to the later of the following dates perform for any person, firm, or corporation other than us, for the purpose of making phonograph records or master recordings, any selection which shall have been recorded hereunder or under any other agreement relating to your recording services to which we were a party: (i) the date five (5) years subsequent to the date on which such selection shall have been last recorded by you hereunder, or (ii) the date two (2) years subsequent to the expiration or termination of the term of this contract (such later date in respect of any such selection being hereinafter sometimes referred to as the "Restriction Date").

(b) You shall not at any time manufacture, distribute, or sell or authorize the manufacture,

16

distribution, or sale by any person, firm, or corporation other than us of phonograph records embodying (i) any performance rendered by you during the term of this contract, or (ii) any performance rendered by you after the expiration or termination of the term of this contract of a selection recorded hereunder if such performance shall have been rendered prior to the Restriction Date applicable thereto. Furthermore, you shall not record or authorize or knowingly permit to be recorded for any purpose any such performance without in each case taking reasonable measures to prevent the manufacture, distribution, or sale at any time by any person, firm, or corporation other than us of phonograph records embodying such performance. Specifically, but without limiting the generality of the foregoing, if during the term of this contract you perform any selection for the purpose of making transcriptions for radio or television or soundtracks for motion pictures, or if, after the expiration or termination of the term of this contract, you perform for any such purpose any selection recorded hereunder prior to the Restriction Date applicable thereto, you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used directly or indirectly for the purpose of making phonograph records. Upon our request, you shall promptly deliver to us a copy of the pertinent provisions of each such contract and you shall cooperate fully with us in any controversy which may arise or litigation which may be instituted relating to our rights pursuant to this paragraph.

11. (a) You expressly acknowledge that your services hereunder are of a special, unique, and intellectual character which gives them peculiar value, and that in the event of a breach by you of any term, condition, or covenant hereof, we will be caused irreparable injury. You expressly agree that in the event you shall breach any provision of this contract, we shall be entitled to injunctive relief and/or damages, as we may deem appropriate, in addition to any other rights or remedies available to us, and we shall have the right to recoup any such damages resulting from any such breach from any monies which may be payable to you hereunder or under any other agreement between you and us or our affiliates.

(b) You shall receive compensation hereunder (inclusive of union scale, advances and royalties) during the term hereof at the rate of a minimum of Six Thousand Dollars ($6,000) per annum. You and we agree

that the inclusion of this provision is intended to
comply with provisions of the Civil Code of the State
of California pertaining to injunctive relief, and that
in the event the applicable statutes (or any of them)
are amended so that a different level of compensation
shall be required for such compliance, the foregoing
provision shall be deemed amended in accordance there-
with.

12. You hereby agree to and do hereby indemnify,
save, and hold us harmless from any and all damages, liabil-
ities, costs, losses and expenses (including legal costs and
attorneys' fees) arising out of or connected with any claim,
demand, or action by a third party which is inconsistent with
any of the warranties, representations, or covenants made by
you in this contract. You agree to reimburse us, on demand,
for any payment made by us at any time with respect to any
such damage, liability, cost, loss or expense to which the
foregoing indemnity applies. We shall notify you of any
such claim, demand, or action promptly after we have been
formally advised thereof. Pending the determination of any
such claim, demand, or action, we shall have the right, at
our election, to withhold payment of any monies otherwise
payable to you hereunder.

13. (a) Nothing herein contained shall obligate
us to permit you to record the minimum number of Masters
specified herein to be recorded during the initial     ·
period or any renewal period hereof, it being under-
stood that our sole obligation to you as to each such
unrecorded Master shall be to pay you an amount equal
to the minimum union scale payment which we would have
been required to pay to you had you in fact recorded
such unrecorded Master.

(b) We shall have the right, at our election,
to suspend the running of the term of this contract and
our obligations hereunder upon written notice to you if
for any reason whatsoever your voice or your ability to
perform as an instrumentalist shall become impaired or
if you shall refuse, neglect, or be unable to comply
with any of your obligations hereunder, or if as a
result of an Act of God, accident, fire, labor contro-
versy, riot, civil commotion, act of public enemy, law,
enactment, rule, order, or act of any government or
governmental instrumentality, failure of technical
facilities, failure or delay of transportation facili-
ties, illness or incapacity, or other cause of a similar
or dissimilar nature not reasonably within our control
or which we could not by reasonable diligence have
avoided, we are hampered in the recording, manufacture,

distribution, or sale of phonograph records or our normal business operations become commercially impractical. Such suspension shall be for the duration of any such event or contingency, and, unless we notify you to the contrary in writing, the term hereof (whether the initial period or any renewal period hereof) during which such event or contingency shall have commenced shall be automatically extended by such number of days as equal the total number of days of any such suspension. During any such suspension you shall not render your services as a recording artist to any other person, firm, or corporation.

    (c) In the event your voice or your ability to perform as an instrumentalist shall become impaired or if you shall refuse, neglect, or be unable to comply with any of your obligations hereunder, then we shall have the right, at our election, in addition to any other rights or remedies which we may have in such event, to terminate this contract upon written notice to you and shall thereby be relieved of any and all obligations hereunder except our obligations with respect to Masters recorded hereunder prior to such termination.

14. You shall, upon our request, appear on dates and at film studios or other locations designated by us upon reasonable notice to you for the filming, taping, or other permanent fixation of audio-visual reproductions of your performances. In connection therewith, we or our designee will make a payment to you for the services to be performed by you within a reasonable time after the completion thereof at the rate of applicable union scale, which such payment shall constitute an advance recoupable from royalties earned by you hereunder or under any other agreement between you and us or any of our affiliates.

15. We shall have the right, at our election, to assign any of our rights hereunder, in whole or in part, to any subsidiary, affiliated, or related company, or to any person, firm, or corporation owning or acquiring a substantial portion of our stock or assets. You shall not have the right to assign any of your rights hereunder.

16. All notices to be given to you hereunder and all statements and payments to be sent to you hereunder shall be addressed to you at the address set forth on page 1 hereof or at such other address as you shall designate in writing from time to time. All notices to be given to us hereunder shall be addressed to us at the address set forth

19

on page 1 hereof or at such other address as we shall desig-
nate in writing from time to time. All notices shall be in
writing and shall either be served by personal delivery (to
an officer of our company if to us), mail, or telegraph, all
charges prepaid. Except as otherwise provided herein, such
notices shall be deemed given when personally delivered,
mailed or delivered to a telegraph office, all charges
prepaid, except that notices of change of address shall be
effective only after the actual receipt thereof. A copy of
each notice to us shall be simultaneously sent to Mitchell,
Silberberg & Knupp, 1800 Century Park East, Los Angeles,
California 90067, Attn: Abraham Somer, Esq.

17.  (a)  This contract sets forth the entire
understanding of the parties hereto relating to the
subject matter hereof. No modification, amendment,
waiver, termination or discharge of this contract or of
any of the terms or provisions hereof shall be binding
upon either of us unless confirmed by a written instru-
ment signed by you and by a duly authorized officer of
our company. No waiver by you or us of any term or
provision of this contract or of any default hereunder
shall affect your or our respective rights thereafter
to enforce such term or provision or to exercise any
right or remedy in the event of any other default,
whether or not similar.

(b)  If any provision of this contract shall
be held void, voidable, invalid, or inoperative, no
other provision of this contract shall be affected as a
result thereof, and, accordingly, the remaining provi-
sions of this contract shall remain in full force and
effect as though such void, voidable, invalid, or
inoperative provision had not been contained herein.

(c)  We shall not be deemed to be in breach
of any of our obligations hereunder unless and until
you shall have given us specific written notice by
certified or registered mail, return receipt requested,
of the nature of such breach and we shall have failed
to cure such breach within thirty (30) days after our
receipt of such written notice.

(d)  Wherever your approval or consent is
required hereunder, such approval or consent shall not
be unreasonably withheld. We may require you to formally
give or withhold such approval or consent by giving you
notice requesting same and by furnishing you with the
information or material in respect of which such approval
or consent is sought. You shall give us written notice
of your approval or disapproval or of your consent or

20

non-consent within five (5) days after such notice is sent and in the event of your disapproval or non-consent, such notice shall contain the specific reasons therefor. Your failure to give notice as aforesaid shall be deemed to be consent or approval, as the case may be, with respect to the matter submitted. In the event the word "you" includes members of a group, then, at our election, any member of the group shall have the right to give approval or consent on behalf of the entire group.

(e)  Nothing herein contained shall constitute a partnership or a joint venture between you and us.  Neither party hereto shall hold itself out contrary to the terms of this paragraph, and neither you nor we shall become liable for any representation, act, or omission of the other contrary to the provisions hereof. This contract shall not be deemed to give any right or remedy to any third party whatsoever unless said right or remedy is specifically granted by us in writing to such third party.

(f)  The provisions of any applicable collective bargaining agreement between us and any labor organization which are required by the terms of such agreement to be included in this contract shall be deemed incorporated herein as if such provisions were expressly set forth in this contract.

(g)  In the event of any action, suit, or proceeding arising from or based upon this contract brought by either party hereto against the other, the prevailing party shall be entitled to recover from the other its attorneys' fees in connection therewith in addition to the costs of such action, suit, or proceeding.

(h)  Except as otherwise provided in this contract, all rights and remedies herein or otherwise shall be cumulative and none of them shall be in limitation of any other right or remedy.

(i)  This contract has been entered into in the State of California, and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California.

(j)  This contract shall not become effective until signed by you and countersigned by a duly authorized officer of our company.

18.  As used in this contract the terms "record" or "phonograph record" shall mean any device, whether now known or unknown, on or by which sound may be recorded for later transmission to listeners, whether embodying sound alone, or sound synchronized with or accompanied by visual images, including, without limitation, discs of any speed or size, reel-to-reel tapes, cartridges, cassettes, or other prerecorded tapes; the term "master recording" shall mean any original recording of sound, whether embodying sound alone or sound synchronized with or accompanied by visual images, which may be used in the recording, production, and/or manufacture of phonograph records, together with any derivatives thereof (other than phonograph records); provided, that the royalty rates provided for in paragraph 6 shall not apply to video-discs, video-cassettes and other audio-visual devices; as to such devices, you and we shall negotiate in good faith as to the rates to be paid therefor and, if we are unable to agree, the matter shall be decided by arbitration in Los Angeles in accordance with the Rules of Commercial Arbitration of the American Arbitration Association; the term "selection" shall mean a single musical composition, medley, poem, story, or similar work; the term "recording costs" shall mean those costs and expenses referred to in paragraph 3(c) hereof; the term "delivery to us", or words of similar connotation used in connection with master recordings or Masters shall mean delivery to our Record Production Manager at our offices in Los Angeles, California of fully mixed, leadered, sequenced and equalized 15 i.p.s. master tapes in proper form for the production of the parts necessary to manufacture phonograph records therefrom and delivery to us at our offices in Los Angeles, California of all consents, approvals, copy information, credits and other material required by us to release phonograph records embodying such master recordings and to manufacture album covers or other packaging therefor; the term "mid-priced record line" shall mean a record line or label the records of which bear a suggested retail list price in the country in question in excess of sixty six and two thirds percent (66-2/3%) and less than eighty percent (80%) of the suggested retail list price in such country of top-line records on which recordings of the majority of our artists are initially released in such country; the term "budget record line" or "low-priced records on which recordings of the majority of our artists are initially released in such country; the term "net royalty" shall mean the gross royalty received by us from a licensee in respect of record sales, less an amount equal to any monies required to be paid by us in respect of such record sales in the form of contributions to the America Federation of Musicians Special Payments Trust Fund or Music Performance Trust Fund, or any similar fund, or in the form of mechanical royalties to the copyright proprietors (or their designess)

of the musical compositions embodied in such records; and the term "net sales" shall mean gross sales less returns and credits of any nature.

19. You hereby grant to us three (3) separate options, each to renew the term of this contract for a period of one (1) year or until one hundred twenty (120) days following completion of delivery of your recording commitment for such period, whichever is later, such renewal periods to run consecutively beginning at the expiration of the initial period, all upon the same terms and conditions applicable to the initial period except as otherwise specified herein. Each option may be exercised only by giving you written notice of our election to exercise such option at any time prior to the commencement of the renewal period for which such option is exercised.

20. (a) You shall be solely responsible for and shall pay any and all royalties or other sums which may be payable to any producer of any of the Masters in respect of the recording and production thereof, the manufacture and sale of phonograph records embodying such masters, and any other exploitation of such Masters.

(b) Notwithstanding anything to the contrary contained herein, we may (but shall not be obligated to) enter into an agreement directly with any producer of any of the Masters which provides for the payment by us, rather than you, of royalties or other compensation payable to such producer in respect of such Masters. In such event, we shall have the right to deduct any royalties payable by us to any such producer in respect of such Masters from any and all royalties or other sums payable to you hereunder. Furthermore, for the purpose of the recoupment of any advances or charges against royalties under this contract, the royalty rates hereunder, contained in paragraph 6 hereof, with respect to such Masters shall be deemed reduced in the amount of the applicable royalty rates with respect to such Masters which are contained in our agreement with such producer. Moreover, in the event that any advances or fees which are paid by us to any such producer shall not be recouped in whole by us from royalties payable to such producer, then we shall have the right to recoup such advances or fees from any monies payable to you hereunder or under any other agreement between you and us or our affiliates.

23

21.   Notwithstanding anything to the contrary con-
tained herein:

(a)  (i)  in the event the aggregate net sales
(including disc and tape) through normal distribu-
tion channels in the United States ("Such Net
Sales") of any specific LP embodying only newly
recorded Masters (hereinafter each such LP is
referred to as an "Eligible LP") recording during
the first renewal period, computed separately LP
by LP, shall exceed five hundred thousand (500,000)
units, then the royalty rate pursuant to paragraph
6(a)(i)(A) hereof shall be increased to thirteen
percent (13%) only with respect to Such Net Sales
of such Eligible LP in excess of five hundred
thousand (500,000) units, but not in excess of one
million (1,000,000) units; and

(ii)  in the event Such Net Sales of such
Eligible LP shall exceed one million (1,000,000)
units, then the royalty rate pursuant to paragraph
6(a)(i)(A) hereof shall be increased to fourteen
percent (14%) only with respect to Such Net Sales
of such Eligible LP in excess of one million
(1,000,000) units.

(iii)  in the event Such Net Sales of any
Eligible LP recorded during the second or third
renewal periods shall exceed five hundred thousand
(500,000) units, then the royalty rate pursuant to
paragraph 6(a)(i)(A) hereof shall be increased to
thirteen percent (13%) only with respect to Such
Net Sales of such Eligible LP in excess of five
hundred thousand (500,000) units, but not in excess
of one million (1,000,000) units; and

(iv)  in the event Such Net Sales of such
Eligible LP shall exceed one million (1,000,000)
units, then the royalty rate pursuant to paragraph
6(a)(i)(A) hereof shall be increased to fourteen
percent (14%) only with respect to Such Net Sales
of such Eligible LP in excess of one million
(1,000,000) units.

(b)  An increase in the royalty rate pursuant
to paragraph 6(a)(i)(A) hereof by reason of the fore-
going provisions of this paragraph shall not result in
the increase in any other royalty rates contained in
paragraph 6.  Accordingly, and without limiting the
generality of the foregoing, for the purpose of comput-
ing any royalty rates pursuant to paragraph 6 which are

based on the royalty rate contained in paragraph
6(a)(i)(A), the provisions of this paragraph shall be
disregarded. As used in this paragraph, the terms "net
sales through normal distribution channels in the United
States" and "Such Net Sales" shall refer to net sales
of records hereunder through our customary distributors
for resale through record or other retail stores for
which a royalty is payable hereunder. Accordingly, and
without limiting the generality of the foregoing, such
terms shall exclude records sold or distributed in the
manner set forth in paragraphs 6(a)(i)(B), 6(a)(ii),
6(b), 6(c), or 6(d) hereof.

22. (a) We agree that we shall pay you Ten Thou-
sand Dollars ($10,000) for the Masters constituting the
First Single, which shall constitute an advance recoup-
able from any and all royalties payable by us to you
hereunder or under any other agreement between you and
us or our affiliates. You hereby acknowledge that we
have, as of the date hereof, paid you Three Thousand
Dollars ($3,000) of the foregoing sum, and we hereby
agree to pay you the balance of Seven Thousand Dollars
($7,000) promptly after your delivery to us of said
Masters and our determination that said Masters are
technically satisfactory for the manufacture and sale
of phonograph records.

(b) Conditioned upon your full and faithful
performance of all of the material terms and conditions
hereof, we shall make the following payments (referred
to below as "recording funds"), each of which shall
constitute an advance recoupable from any and all royal-
ties payable by us to you hereunder or under any other
agreement between you and us or our affiliates. In
each instance we shall pay you one-fourth (1/4) of the
recording fund applicable to a specific single or LP
upon the commencement of recording thereof, and, upon
delivery of such single or LP, we shall make the further
payment to you in respect of such single or LP in the
amount by which the recording fund applicable to such
single or LP exceeds the sum of the commencement payment
and the aggregate recording costs paid or incurred by
us with respect to such single or LP.

| Single or LP | Recording Fund |
|---|---|
| Second Single, if any | $ 12,500.00 |
| First LP, if any | $100,000.00 minus the advances previously paid to you in accordance herewith for the First Single and the Second Single, if any |
| Second LP, if any | $150,000.00 |
| Third and Fourth LPs, if any | $250,000.00 per LP |
| Fifth and Sixth LPs, if any | $300,000.00 per LP |
| Seventh and Eighth LPs, if any | $350,000.00 per LP |

(c)  In addition, conditioned upon your full and faithful performance of all the material terms and conditons hereof, in the event that we shall make gross shipments (less actual returns and less any return authorizations issued by us) to our subdistributors in the United States (hereinafter referred to as "Adjusted Gross Shipments") of 150,000 units of either the First LP or the second LP of your recording commitment hereunder, we shall promptly thereafter pay you, as an advance recoupable from any and all royalties payable by us to you hereunder or under any other agreement between you and us or our affiliates, the sum of Twenty-Five Thousand Dollars ($25,000.00), and in the event that we shall make Adjusted Gross Shipments of 250,000 units of either such LP, we shall promptly thereafter pay you, as

an additional advance so recoupable, the sum of Twenty-Five Thousand Dollars ($25,000.00).

If the foregoing correctly reflects your understanding and agreement with us, please so indicate by signing below.

Very truly yours,

A & M RECORDS, INC.

By _Burnett Powell_____

AGREED AND ACCEPTED:

_Gary A. Taylor_____
GARY TAYLOR
Birth Date: 1 / 18 / 51

Musical Compositions Contained on the Masters
Constituting the "First Single" Pursuant to
the Agreement between A&M Records, Inc. and
Gary Taylor Dated as of April 15, 1983.

    1.    "On the Line"

    2.    "Down for the Count"